IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| DORIAN STEPNEY, TRISTAN STEPNEY, DERRICK STEPNEY, and CYNTHIA STEPNEY, individually and on behalf of her minor children DARIUS STEPNEY, RODNEY STEPNEY, and TONI STEPNEY, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | 07 C 5842 Judge James B. Zagel |
| v. | ) ) | |
| CITY OF CHICAGO, EMMETT MCCLENDON, MARK HEIN, MELVIN BRANCH, FRED WALLER, BRIAN HAWKINS STEVEN MALDONADO, MARTIN TERESI, MIGUEL CUADRADO, ANTHONY SCHULZ, | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | JURY TRIAL DEMANDED |

## PLAINTIFFS' MEMORANDUM IN RESPONSE TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Arthur Loevy
Jon Loevy
Russell Ainsworth
Elizabeth Mazur
LOEVY & LOEVY
312 N. May Street, Suite 100
Chicago, Illinois 60607
(312) 243-5900

Now come Plaintiffs, Cynthia Stepney, Derrick Stepney, Dorian Stepney, Tristan Stepney, Rodney Stepney, Toni Stepney, and Darius Stepney, all by and through their counsel, Loevy & Loevy, and submit the following memorandum in response to Defendants' motion for partial summary judgment:

## Introduction

Eight of the Defendant Officers in this case, comprising a team of Chicago tactical police officers ("McClendon Defendants"), swarmed Plaintiffs' home under the mistaken assumption that Plaintiffs had something to do with the recent theft of a Sony PlayStation video game console, a flat screen TV, and several video games from Defendant McClendon's nearby residence. Rather than leave the investigation of this burglary to the local police district officers, the Defendants took it upon themselves to rampage through the neighborhood in search of the persons responsible for robbing their team member's home.

It is undisputed that Plaintiffs had nothing to do with that burglary, and that there was no probable cause for the Defendants to enter Plaintiffs' home, seize the Plaintiffs, or use force against them. Accordingly, the only possible justification for Defendants' entry into Plaintiffs' home is Plaintiffs' consent, which Defendants claim to have obtained. That story, however, is impossible to square with the three contemporaneous calls to 911 from the Stepney home complaining about the Defendants' conduct and asking for a supervisor to harness the out-of-control police officers (which are glaringly omitted from Defendants' 158 paragraphs of uncontested facts).

Recognizing that their consensual-entry defense holds no weight in a motion for summary judgment, Defendants instead try to release some of McClendon's team from liability by arguing that they did not admit going inside the Plaintiffs' home and thus cannot be responsible for what happened therein. When viewed in the light most favorable to Plaintiffs, however, the record establishes that all eight of the McClendon Defendants entered the Stepney home and, therefore, their denials on that topic are controverted and cannot justify summary judgment in their favor.

As to the one Defendant who is not a member of McClendon's team, Plaintiffs agree that Defendant Schulz, the supervisor dispatched in response to the 911 pleas for help from the Stepneys' home, did not enter the home and is therefore not liable for Plaintiffs' excessive force, unlawful entry, or unlawful search claims. However, credible evidence places Schulz at the scene and, therefore, he is liable for his refusal to stop the violation of Plaintiffs' constitutional rights, under a failure to intervene theory of recovery.

In sum, none of the Defendant Officers is entitled to summary judgment in this case.

## I. Facts

Officer Emmett McClendon is a Chicago police officer who works on a gang intelligence team. Plaintiffs' Statement of Additional Facts ("PSAF") ¶¶ 3, 7. On August 28, 2007, his home was burglarized. *Id.* at ¶ 5. The burglars took Defendant McClendon's Sony PlayStation, seventeen video games, and flat screen TV. *Id.* at ¶ 6.

At the time that McClendon learned about the burglary, he and seven other members of his team were in the field investigating a violent crime, either an aggravated battery (shooting) or a murder. *Id.* at ¶ 7. When McClendon's team learned of the burglary, they abandoned that investigation and went to Defendant McClendon's neighborhood. *Id.* at ¶ 8.[1]

In the course of the investigation, the team eventually came upon the Stepney family home, which is located about a block away from Officer McClendon's home. *Id.* at ¶¶ 3, 11. A number of teenagers, including Plaintiffs Tristan, Rodney, Toni, and Darius (as well as some of their friends) were on the porch of the Stepney home. *Id.* at ¶ 11. Plaintiff Cynthia Stepney was inside her home with her eldest son, Plaintiff Dorian, her brothers, Plaintiff Derrick and Jefty Stepney, her niece, Robin Stepney, and Robin's baby. *Id.* at ¶ 4; Defendants' Statement of Material Facts ("DSMF") ¶ 122.

---

[1] Investigating burglaries is not a normal assignment for these officers, nor is it part of the gang intelligence team's mission. *Id.* at ¶ 9. McClendon's team investigated this particular burglary because a member of their team had been robbed. *Id.*

Defendant Hawkins approached the Stepney home and asked the teenagers if he could talk to a parent. *Id.* at ¶ 12. Cynthia Stepney then emerged from the house and Hawkins asked her for permission to search the home. *Id.* ¶ 13. Ms. Stepney said no, but Defendant Hawkins stated that they were going to search her home anyway, and two McClendon Defendants proceeded to go inside the Stepney home without anyone's consent. *Id.* at ¶ 14.

Because Cynthia would not agree to let the officers in the house, Hawkins handcuffed Tristan Stepney to the front porch railing and punched him in the stomach. *See* Pl's Response to DSMF ¶ 60. Other Defendants then entered the house, including Defendant McClendon. PSAF at ¶ 20. Eventually, all eight members of McClendon's team entered the house. *Id.* at ¶¶ 8, 16-20; DSMF ¶ 98.

Soon after Defendant McClendon entered the home, he accused Dorian of stealing his electronics (which Dorian denied), and the two began arguing. PSAF ¶ 21. Officer McClendon threatened to harm Dorian physically, and Ms. Stepney told McClendon not to talk to her son in such a manner. *Id.* McClendon proceeded to grab Dorian around the neck, choke him, throw him onto a couch, and punch him. DSMF ¶ 43. Cynthia Stepney was standing close to her son Dorian as this altercation occurred, and two Defendants were holding her on either side. PSAF ¶ 21; DSMF ¶ 20. When Cynthia tried to jerk away, a Defendant's hand struck her in the face. DSMF ¶ 21. Ms. Stepney then saw Defendant McClendon reach for his gun, at which point she blacked out. DSMF ¶ 23.

In response to the Defendants' egregious actions, Jefty Stepney called 911 to report that officers were invading his home and to request a supervisor's intervention. PSAF ¶ 29. After Jefty made his first call at 10:32 p.m., the abuse continued unabated. *Id.* Jefty repeated his cries for help by calling 911 again at 10:47 p.m. and a third time at 10:57 p.m. *Id.* At 10:48 p.m., Defendant Sergeant Anthony Schulz was dispatched to the Stepney home in response to Jefty's pleas, but he did nothing to stop the unlawful conduct of McClendon's team. *Id.* at ¶ 30-40.

Two of the McClendon Defendants from McClendon's team, Hein and Teresi, entered the Stepneys' back yard. *Id.* at ¶ 19. They stayed in the yard, uninvited, in order to stop anyone who might leave the Stepneys' home. *Id.*

It was a chaotic scene at the Stepney home. Between McClendon's team and Stepney family members and their guests, there were about twenty people at the home. *Id.* at ¶¶ 4, 8. People were arguing and shouting, and the officers were using violence. *Id.* at ¶ 24. A glass table inside the Stepney home shattered. DSMF ¶ 110. The officers stayed at the Stepney home for one hour or more, until around 11:30 p.m. DSMF ¶ 29; PSAF ¶ 37. Before leaving, the officers detained both Dorian and Tristan in police cars, though both young men were released without being charged. DSMF ¶¶ 46, 150; PSAF ¶ 25. No report was filed by McClendon or any member of his team regarding their need to cuff or use force against Plaintiffs. PSAF ¶ 25.

Plaintiffs did not have anything whatsoever to do with the burglary of McClendon's home, and the Defendants do not suggest that there was any probable cause to believe that they did. Indeed, despite extensive searching, the Defendants did not find any of Officer McClendon's stolen items in the Stepney home, nor any other contraband for that matter. PSAF ¶¶ 27, 28. Officer McClendon's PlayStation, video games, and TV were later recovered at other residences; they had been stolen by some 14- and 15-year old boys unconnected to any of the Plaintiffs. *Id.*

## II. Argument

Summary judgment is proper when the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding a motion for summary judgment, the court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). The Court must view the record and draw all reasonable inferences in a light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The burden is on the moving party to show that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A.  There Is a Genuine Issue of Material Fact As to Whether Defendants Hein, Hawkins, Waller, Maldonado, Teresi Unlawfully Searched the Stepneys' Home (Count I).

Defendants argue that Plaintiffs' unlawful search claims can survive only against the Defendants who admit to going inside the Stepney home. In support, Defendants observe that Plaintiffs could not affirmatively identify all of the officers they saw inside their home that night. In making this argument, Defendants rely on an unfair reading of the facts and ignore key inferences that must be drawn in Plaintiffs' favor.

1.  Plaintiffs' Testimony Places Hawkins and Teresi Inside the Stepney Home.

Even though the Plaintiffs could not list the names of all the Defendants who were in their home that night (indeed, the officers were all in plainclothes, DSMF ¶¶ 77, 117, 130), their testimony easily places Hawkins and Teresi inside the Stepney home that night. For example, there is no dispute that Hawkins is the bald officer who handcuffed Tristan Stepney to the porch that evening. PSAF ¶ 15. Plaintiff Rodney Stepney testified at his deposition that he saw the same officer who handcuffed Tristan (i.e., Hawkins) go inside the Stepney home. *Id.* at ¶ 18. Similarly, facts in the record show that Officer Teresi is the person who initially approached the house with Sergeant Hawkins that night. *Id.* at ¶ 17. Plaintiff Tristan Stepney testified that this officer (Teresi) also went into the Stepney home that evening. *Id.*

Even though Sergeant Hawkins and Officer Teresi have denied going into the Stepney home that evening, the record says otherwise. Because there are facts in the record to show that Hawkins and Teresi were inside the Stepney home that evening, they are in the same position as officers McClendon, Branch, and Cuadrado, who admit to entering into the Stepeny home. And, as Defendants concede, these officers are not entitled to summary judgment because there was no justification for any officers to be in Plaintiffs' home.

## 2. Hein and Teresi Admit that they Entered the Stepneys' Backyard, which, for the Purposes of this Summary Judgment Motion, is the Same as Having Entered the Stepneys' Home.

Officers Teresi and Hein admit that they entered into the curtilage of the Stepney home and remained there so that they could stop anyone who tried to leave the house. *Id.* at ¶ 19.[2] For the purposes of the Fourth Amendment, the analysis is no different than if they had entered into the Stepney's home. And just as the officers who entered the Stepney home are not entitled to summary judgment, neither are Hein and Teresi.

It is well-established that the Fourth Amendment's protection does not stop at a house's front door. "Both a home and the home's curtilage--i.e., the area outside the home itself but so close to and intimately connected with the home and the activities that normally go on there that it can reasonably be considered part of the home--are within the scope of the Fourth Amendment's protection." *Bleavins v. Bartels*, 422 F.3d 445, 450-451 (7th Cir. 2005) (quoting *Siebert v. Severino*, 256 F.3d 648, 653-54) (7th Cir. 2001); *see also Oliver v. United States*, 466 U.S. 170, 182 n.12 (1984) ("[T]he conception defining the curtilage--as the area around the home to which the activity of home life extends--is a familiar one easily understood from our daily experience."). "A warrantless search of a home's curtilage implicates the 'very core' of the Fourth Amendment and presumptively is unreasonable." *Bleavins*, 422 F.3d at 451 (citing *Payton v. New York*, 445 U.S. 573, 585-86 (1980).

Courts look at four factors to determine whether property is part of a home's curtilage: (1) the proximity of the area in question to the home; (2) whether the area is included in an enclosure surrounding the home; (3) how the owner uses the area; and (4) the measures taken to protect the area from observation. *Bleavins*, 422 F.3d at 451 (citing *United States v. Dunn*, 480 U.S. 294, 301 (1987)).

---

[2] It is reasonable to infer that Officers Teresi and Hein also looked for McClendon's stolen goods while they were in the back yard.

6

Based on these factors, there is no question that the Stepneys' back yard is part of their home's curtilage. The back yard is completely enclosed by a fence, is not visible from the street, and is used by the Stepneys for eating meals, cooking, listening to music, and letting their children play. PSAF ¶ 2. The back yard is directly between the Stepneys' home and their garage. *Id.* It is small, just about the same size as the Stepneys' garage. *Id.* The Stepneys' back yard is well within the legal definition of curtilage. *Cf. United States v. Conrad*, 578 F. Supp. 2d 1016, 1027-28 (residential back yard deck is curtilage); *People v. Stork*, 203 Ill. App. 3d 1028, 1023-33, 561 N.E.2d 419, 421-22 (5th Dist. 1990) (unenclosed area 50 feet behind house is curtilage).

### 3. In any event, it is Reasonable to Infer that All of McClendon's Team Members Entered Into the House.

Regardless of who can place whom inside the Stepney's house or back yard, none of the Defendant Officers are entitled to summary judgment on Plaintiffs' unlawful search claim because it is reasonable to infer that each of them unlawfully entered the Stepney house.

All eight members of McClendon's team were at the Stepney home at some point that evening. PSAF ¶¶ 8, 16-20; DSMF ¶ 98. They were all there for the same general purpose: to recover McClendon's Sony PlayStation, video games, and TV. *Id.* at ¶ 8. Each of the McClendon Defendants "played a vital role" in trying to recover these items. *Id.* at ¶ 26.

Plaintiffs' testimony shows that there were eight or nine officers inside the Stepney house. DSMF at ¶ 98. Defendants do not claim that any police officers other than themselves entered the Stepney home. Accordingly, viewing these facts in the light most favorable to Plaintiffs, the eight or nine officers inside the Stepney home comprised the eight members of McClendon's team, *i.e.*, all Defendants but Schultz. At the very least, there are sufficient facts in the record for Plaintiffs' unlawful search claims against each of the team members to go to a jury. *See Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000) (where Plaintiff was able to identify the universe of officers present when he was beaten, it was a question for the jury to determine which of the officers were responsible for the beating). None of the McClendon Defendants is entitled

to summary judgment on Plaintiff's unlawful search claim.

B.         **There Is a Genuine Issue of Material Fact as to Which Member of McClendon's team Used Excessive Force Against Cynthia Stepney (Counts II, V, VI, and VII).**

As Defendants acknowledge, there is no summary judgment issue as to Dorian Stepney and Tristan Stepney's excessive force claims against Defendants McClendon and Hawkins. *See* Defs' Memo at 10. Dorian alleges that Defendant McClendon used excessive force against him, and Tristan alleges that Defendant Hawkins used excessive force against him. For that reason, Defendants concede that neither McClendon nor Hawkins is entitled to summary judgment on Count II.[3]

Defendants contend, however, that Cynthia Stepney has no triable excessive force claim against any McClendon's Defendant because Ms. Stepney does not know which one of them struck her. This argument lacks merit. Even though Ms. Stepney does not know her assailant's identity, facts in the record support an inference that the person who struck her was either Defendant Cuadrado or Defendant Branch. Cuadrado and Branch admit that they entered the Stepney home along with Defendant McClendon. It was soon after they entered that McClendon began choking Dorian, and Cynthia attempted to intervene on Dorian's behalf. As she was trying to intervene, two officers took hold of her, one on either side. When Cynthia tried to jerk away from these officers, she was struck in the head.

Although neither officer acknowledges holding onto or striking Ms. Stepney, Defendant Branch admits making physical contact with her. PSAF ¶ 23. Defendant Cuadrado admits that he was present with Ms. Stepney while he observed the physical interaction between Defendant McClendon and Dorian Stepney. *Id.* at ¶ 22. Based on these facts, it is reasonable to

---

[3] For the same reason that Plaintiffs' excessive force claims (Count II) should not be dismissed against these officers, Plaintiffs' assault and battery claims likewise should not be dismissed. And to the extent that Plaintiffs' assault and battery claims remain against these officers, their claims against the City for respondeat superior (Count VI) and indemnification (Count VII) should likewise remain part of this case.

conclude that Defendant Branch and/or Defendant Cuadrado used excessive force against Ms. Stepney. For that reason, Defendants Branch and Cuadrado are not entitled to summary judgment on Plaintiffs' excessive force claim.

In fact, for the same reason that this argument fails for all McClendon Defendants on Plaintiffs' unlawful search claim (Count I), it also fails with respect to Cynthia Stepney's excessive force claim (Count II). There is no question that the officer who struck her was a member of McClendon's team and was in the Stepney home that night. If Defendants maintain that neither Cuadrado nor Branch struck Cynthia, then it had to be another member of the team who did. With these facts, the universe of potential assailants is narrowed, and Plaintiffs have therefore put forth enough evidence to reach a jury on Cynthia Stepney's excessive force claim. *See Miller*, 220 F.3d at 495; *see also Rutherford v. City of Berkeley*, 780 F.2d 1444 (9th Cir. 1986) (where plaintiff was able to narrow the universe of potential assailants to certain named officers, "a jury could reasonably infer that the named officers were participants" in the assault); *Cooper v. City of Fort Wayne*, 2007 WL 1455763, at *9 (N.D. Ind. May 15, 2007) (question for jury as to which defendant struck plaintiff who was not able to identify assailant).

### C.     None of the McClendon Defendants is Entitled to Summary Judgment on Plaintiffs' Unlawful Detention Claim (Count III).

With respect to Plaintiffs' unlawful detention claim, Defendants again try to hang their hat on Plaintiffs' inability to say with certainty which members of McClendon's team were at which location when.

As Defendants concede, none of the officers who can be placed in the Stepney home is entitled to summary judgment on Plaintiffs' unlawful detention claims. *See* Defs' Memo at 11 ("To the extent that these officers do admit to entering the home . . . summary judgment cannot be brought on their behalf.") As Plaintiffs have discussed at length above, all members of McClendon's team can be placed in the Stepney home that night. *See* Part II.A.2-3, *supra*. For that reason, none of the Defendant Officers, save for Sergeant Schulz, is entitled to summary

judgment on Plaintiffs' unlawful detention claim.

> **D.     None of the McClendon Defendants is Entitled to Summary Judgment on Plaintiffs' Failure to Intervene Claim.**

Defendants argue they are all entitled to summary judgment on Plaintiffs' failure to intervene claim (Count IV) on the basis that Plaintiffs could not identify or describe the officers at the scene. This argument again lacks merit.

All eight McClendon Defendants were at the Stepney home that night. PSAF ¶¶ 8, 16-20; DSMF ¶ 98. Plaintiffs' inability to describe certain members of the team with particularity is hardly fatal to Plaintiffs' claim. Based on the facts in the record, a jury could easily conclude that each of the following is true: Defendant Teresi could have intervened to stop Defendant Hawkins' unlawful detention of and use of excessive force toward Tristan Stepney, PSAF ¶ 16; Defendant Hawkins and Defendant McClendon could have intervened to stop their team members' unauthorized entry into the Stepney home, DSMF ¶¶ 11; Defendants Cuadrado and Branch could have intervened to stop McClendon from attacking Dorian Stepney inside the Stepney home, PSAF ¶¶ 20-23; and Officer Hein could have intervened to stop Defendant Teresi's unlawful occupation of the Stepney's back yard, PSAF ¶ 19, or to stop the unlawful detention of Tristan Stepney, DSMF ¶ 150.

Even Defendants Maldonado and Waller -- both of whom claim that they were out in front of the house for a short time only and never entered into the house -- would not be entitled to summary judgment. Apart from the fact that the record places them inside that evening, the entire team set aside legitimate police work in order to advance Defendant McClendon's personal agenda, and they abused their police powers in the process. Any officer outside the Stepney home during the chaotic encounter certainly would have seen Tristan Stepney while he was handcuffed to the front porch for 40-60 minutes and/or observed the yelling, cursing, fighting, and violence going on at the Stepney home. DSMF ¶ 70; PSAF ¶¶ 21, 24. Under these circumstances, it is reasonable to infer that Officer Maldonado and Sergeant Waller had reason to know that the

Stepneys' constitutional rights were being violated and that they had an opportunity to intervene to stop it. The Defendant Officers are not entitled to summary judgment on Plaintiffs' failure to intervene claims.

### E. There is a Genuine Issue of Material Fact as to Whether Sergeant Schulz Failed to Intervene to Protect Plaintiffs' Rights.

An officer can be liable under Section 1983 for failure to intervene if (1) the officer had reason to know that a constitutional violation was being committed; and (2) the officer had a realistic opportunity to intervene to prevent the harm from occurring. *Chavez v. Illinois State Police*, 251 F.3d 612, 652 (7th Cir. 2001); *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). Sergeant Schulz is not entitled to summary judgment on Plaintiffs' failure to intervene claim.[4]

#### 1. Sergeant Schulz Was Present When McClendon's Team was Violating Plaintiffs' Constitutional Rights.

Sergeant Schulz was dispatched at 10:48 p.m. to the Stepney home in response to Jefty's repeated complaints that a police officer had unlawfully entered his home. PSAF ¶¶ 29, 30. Sergeant Schulz immediately acknowledged the dispatch when it went out over the radio at 10:48 p.m. *Id.* at ¶¶ 31-32. In fact, a fellow supervisor radioed that he was about to accept the assignment, but Sergeant Schulz interjected and affirmatively volunteered to take the assignment, informing dispatch and the other supervisor that he would "take care of it." *Id.* at ¶ 32. Schulz did not clear from the call at the Stepney house until 12:04 a.m. *Id.* at ¶ 35.

At his deposition, Sergeant Schulz claimed that he did not arrive at the Stepney home until sometime around midnight (and thus after the constitutional violations occurred) because he was too busy with other police work. PSAF ¶ 33. This assertion is not credible. Sergeant Schulz

---

[4] Defendants' motion asks this Court to dismiss Plaintiffs' claims for unlawful search, detention, or use of excessive force against Sergeant Schulz. Defendants' briefing on this issue is a waste of this Court's time. Had Defendants followed this Court's instructions to meet and confer with Plaintiffs before filing their summary judgment motion, Plaintiffs would have volunteered to drop these claims against Sergeant Schulz.

cannot recall anything specific that he might have been doing that would have prevented him from going directly to the Stepney home when he got the dispatch. *Id.* Schulz was not dispatched to any other assignments between 10:48 p.m. and 12:04 a.m. *Id.* at ¶ 35. There are no documents that show his presence at any other location during this period of time. *Id.* at ¶ 36.

Furthermore, in an obvious attempt to place himself at the scene when it was too late to do anything, Sergeant Schulz offers an implausible story. Schulz asserts that when he got to the Stepneys' house, he did not see any officers or other persons on the scene. DSMF ¶ 155. Schulz further asserts that it looked like no one was home when he got there and that he rang or knocked on the front door but no one answered. *Id.* at ¶¶ 156, 157.

This story also cannot be true. To begin, Sergeant Schulz never radioed dispatch to say that he responded and no one was home. PSAF ¶ 35. Moreover, had Sergeant Schulz approached the Stepney home any time after McClendon and his team left he would have seen the Stepneys' living room light on. *Id.* at ¶ 39-40. After the upheaval from the Defendants' physical attack and unlawful search, Cynthia Stepney was awake and in her living room (which is adjacent to the front of the home) from approximately 11:30 p.m to 3:30 a.m., but no one knocked on the door. *Id.* at ¶ 40.[5]

Based on these facts, it is reasonable to infer that Defendant Schulz remained occupied with the call from the Stepney house from 10:48 p.m. until 12:04 a.m. Because McClendon and his team members were at the Stepney home until at least 11:30 p.m., viewing the facts in the light most favorable to Plaintiffs, Defendant Schulz arrived at the Stepney home when the McClendon team was inside the Stepney home terrorizing Plaintiffs.

---

[5] Additionally, had Schulz approached the Stepney home anytime between 11:55 p.m. and 12:15 a.m., he would have seen Toia Stepney and other members of their family out on the front porch recovering from the trauma of the Defendants' attack. PSAF ¶ 38.

12

## 2. Sergeant Schulz Had A Realistic Opportunity to Intervene To Prevent McClendon's Team From Violating Plaintiffs' Rights.

As a supervisor, Defendant Schulz had a realistic opportunity to stop the constitutional abuses. When he was dispatched, he was told that someone had called from the Stepney home saying that a police officer came to the caller's house without permission and that the caller wanted to see a sergeant. PSAF ¶ 31. Defendant Schulz then went to the Stepney home and, as stated above, credible evidence places Schulz there while the rest of the Defendants were violating Plaintiffs' constitutional rights. Accordingly, for summary judgment purposes, it is established that Defendant Schulz lied about his whereabouts. Viewing the record in Plaintiffs' favor, the only inference this Court can draw from Defendant Schulz's false denials is that he had a reason to lie – he knew that his fellow officers were not supposed to be inside the Stepney home, and he failed to stop them. Otherwise, if the other Defendants were not doing anything improper, Defendant Schulz would simply report that he responded to the call and found everything in order.

It is true, as Defendants observe, that none of the Plaintiffs is aware of a supervisor ever coming to their home that evening, but that hardly forecloses their failure to intervene claim against Sergeant Schulz. It is entirely plausible that Schulz responded to the scene, spoke with members of McClendon's team who were not inside Stepney home, saw what was happening, and decided to look the other way. Under these circumstances, none of the Plaintiffs would have any reason to know whether Schulz arrived at the scene.

Based on these facts, a jury could certainly find that Sergeant Schulz had reason to know that Plaintiffs' rights were being violated and that Sergeant Schulz had a realistic opportunity to intervene to prevent the violations from continuing.

### 3. Defendants Cite No Cases to Support Dismissal of Plaintiffs' Failure to Intervene Claims Against Sergeant Schulz.

To be sure, none of the cases cited by Defendants support Sergeant Schulz's claim that he is entitled to summary judgment. Those cases concern defendants whose connections to the constitutional violation at issue are extremely tenuous. *E.g.*, *Martin v. Tyson*, 845 F.2d 1451, 1455 (7th Cir. 1988) (county jail detainee suing over jail conditions could sue jail personnel, but not county commissioners who did not ensure that jail met certain standards; commissioners had no personal involvement with detainee); *Eades v. Thompson*, 823 F.2d 1055, 1063 (7th Cir. 1987) (dismissing prison administrators from inmate's complaint alleging medical mistreatment); *Walker v. Rowe*, 791 F.2d 507 (prison officials who had no responsibility for worker safety dismissed from lawsuit by prison guards alleging unsafe working conditions).

In contrast to these cases, Sergeant Schulz had direct personal involvement with the situation at the Stepney's home that night. He was the supervisor dispatched to the Stepneys' home in response to the Stepneys' cries for help. Unlike the Defendants in *Martin*, *Eades*, or *Walker*, Schulz was personally responsible for intervening on the Stepneys' behalf. In fact, he affirmatively undertook this responsibility and, unlike the Defendants in *Martin*, *Eades*, and *Walker*, Sergeant Schulz was physically present at the scene of the constitutional violations. Defendant's cases are entirely of no assistance to Defendant Schulz; he is not entitled to summary judgement on Plaintiffs' failure to intervene claim.

### F. Defendants' Argument Regarding Qualified Immunity is at Best Unsupported and at Worst Frivolous.

Defendants argue that they are entitled to summary judgment on their affirmative defense of qualified immunity, but offer no arguments that actually support a qualified immunity defense. Instead, they rehash the same arguments they made with respect to Plaintiffs' *prima facie* case, namely, that Plaintiffs cannot prove their case against certain defendants. *See* Defs' Memo at 14 ("Plaintiffs cannot meet their burden and demonstrate that [defendants'] alleged

conduct was unconstitutional.")

It appears, though it is not entirely clear, that Defendants might be trying to argue that they are entitled to qualified immunity because Plaintiffs cannot prove the existence of a "clearly established" constitutional right in this case. To the extent that Defendants are trying to make such an argument, however, it must be rejected.

Based on the facts in the record, a jury could easily conclude the defendant officers engaged in pure vigilante justice when they learned that their team member's Sony PlayStation, video games, and flat screen TV were stolen. Instead of reporting this garden-variety theft to the officers who would normally handle such a crime, this group of gang and tactical officers (who would otherwise be investigating a violent crime) took it upon themselves to apprehend the thief at any cost. They abused their police power by barging into the Stepney home and searching it without permission, a warrant, or probable cause to believe they were responsible for any crime. While engaging in this unlawful search, the officers punched, handcuffed, choked, and detained two young men, neither one of whom had done anything unlawful whatsoever.

An argument that this conduct does not violate any "clearly established" constitutional rights borders on frivolous. "At the very core" of the Fourth Amendment "stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961). With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no. *Kyllo v. United States*, 533 U.S. 27, 31 (2001). It is difficult to imagine a more "clearly established" constitutional right than to be free from an unlawful search and seizure than the Stepneys' experienced at the hands of the Defendant Officers. None of the Defendant Officers is entitled to summary judgment on a qualified immunity defense.

## Conclusion

For the foregoing reasons, Defendants' motion for partially summary judgment should be denied, except as set forth above.

RESPECTFULLY SUBMITTED,

/s/ Elizabeth Mazur
Attorneys for Plaintiffs

Arthur Loevy
Jon Loevy
Russell Ainsworth
Elizabeth Mazur
LOEVY & LOEVY
312 N. May St, Suite 100
Chicago, IL 60607
(312) 243-5900

## CERTIFICATE OF SERVICE

I, Elizabeth Mazur, an attorney, certify that on July 29, 2010, I sent by CM/ECF electronic filing a copy of this document to counsel of record.

/s/ Elizabeth Mazur